The case on the docket today is 5-13-147, People v. Bozarth. My name is Maggie Heim and I represent the defendant Ms. Caitlin Bozarth in this matter. Caitlin was found guilty of a DUI following a stipulated bench trial. This is her direct appeal from the denial of a motion to suppress evidence and to quash an arrest. The trial court entered an agreed disposition of supervision with certain findings. Now, the state has challenged this court's jurisdiction, arguing that there can be no appeal from the finding of guilt because supervision was imposed, as opposed to probation or any other sentence. Well, there hasn't been a judgment entered, has there? That's the argument that there's no final judgment entered, so there is no jurisdiction. But in this case, final judgment or any appeal provided by Supreme Court rule is allowed. And in this case, Supreme Court Rule 604B provides jurisdiction for this court. The appellate court has previously considered this argument and looked at Rule 604B and the intent of the Supreme Court in drafting Rule 604B and found that it clearly allows an appeal from the finding of guilt when supervision is imposed. This is covered in detail in the reply brief, but if there are any questions, I'm happy to take them. Otherwise, I'll be moving to the substance of the appeal. The facts here aren't in contention. This all began late one night in January 2012. A state trooper was patrolling a rural highway and there wasn't much going on. There were no other cars on the road. There were no people around. Nothing was happening. At about 1.30 in the morning, Caitlin drove by. The officer saw her and he decided that he'd flip a U-turn to follow her just to see if anything happened. He didn't report that there were any traffic violations, nothing unusual about how she was driving, no reports of crime in the area. She was just the only car in the area, so he thought he'd follow her. After about a half mile of uneventful driving, Caitlin turned right into a private driveway. Now, partway up this driveway, there was a pole barn, and then further up at the end of the driveway was a private residence. According to the officer, this was about 175 yards from the pole barn to the residence. Caitlin pulled into a parking lot, which was adjacent to the pole barn, and parked her car. Now, the officer saw Caitlin turn off the public roadway into the private driveway, but he didn't actually see where she parked. He decided to go ahead and continue following her just to see if anything was going on, and when he found her parked car, he stopped his car, and he angled his car behind hers about one and a half car lengths back. He got out, and he approached her driver's side door, who was in uniform. He had a flashlight out and his gun drawn, and he asked whether this was her property. When she responded, he smelled alcohol on her breath, and he went back and hit the lights on his car. Now, the key question in this case is, when was Caitlin stopped for Fourth Amendment purposes? The purpose of the Fourth Amendment is to safeguard privacy and security against arbitrary intrusions, and it does this by imposing a standard of reasonableness on the conduct of state actors. This Fourth Amendment reasonableness test applies whenever a citizen is stopped by a police officer, whether it's through physical force or a show of authority. It does not apply, however, to consensual encounters. Now, a citizen is stopped if a reasonable person would not feel free to disregard the officer or terminate the encounter. In Ludeman, the Illinois Supreme Court reviewed a non-exhaustive list of factors which are indicative of a stop when an officer approaches a parked car, which is what we have in this case. The Ludeman court included the display of a weapon and whether the car is boxed in as factors indicative of a stop. In Gerda, the court relied on the fact that two officers who were in uniform with all of their gear approached a car parked in their apartment complex from either side to say this was indicative of a stop. In Thomas, the court found that simply pulling a police vehicle into the path of a biker was a show of authority, which would have been a stop had the biker in fact stopped. So in this case, the question before this court is, would a reasonable person in Caitlin's position feel free to ignore a uniformed officer approaching her with his gun drawn? The officer had just followed her up a private driveway, and he'd angled his car behind her, impeding her ability to get back to the driveway or to the public road. Under these facts, a reasonable person would not feel free to disregard the officer's instructions, and as a result, Caitlin was stopped. Now, the state points to Ludeman to say that this was a consensual encounter, but this case is distinguishable. In Ludeman, there were no factors indicative of a stop. The officer in Ludeman pulled past the defendant, and he parked in the opposite direction and in the center of the road, so there was no competing of the defendant's car. They were parked in opposite directions apart from each other. Here, Caitlin had a pole barn on the right side of her car, and an officer parked at a diagonal behind her. The Ludeman court also emphasized that while the officer used a flashlight, this wasn't a show of authority because there was no other coercive behavior going on. He just needed to be able to see at night. Here, we have an officer approaching not only with a flashlight to light his way, but with his gun out. Now, the state speculates that this court shouldn't consider the gun because we don't have testimony that Caitlin saw the gun, but they can cite to no case where a drawn weapon is not considered a show of authority. The Fourth Amendment analysis is, importantly, an objective review of police conduct and its effect on the reasonable citizen, not the blind citizen or the unobservant or the distracted-in-the-moment citizen. In Searles, the appellate court recognized that an officer simply reaching for his weapon is indicative that Terry Stock is becoming an arrest, which requires probable cause. The court didn't analyze if or when the defendant saw the officer's hand moving to his hip. They simply recognized that when you use a gun to speak with a citizen, you're escalating that encounter. What did the record show here? Did the record show that she saw him reach for his—he had his gun, or did—there was no record showing that? Caitlin didn't testify. She didn't testify. There was no evidence that she saw him. Right, so there was no evidence. It was only the officer's observations. You're citing all cases where the gun was seen. Well, in Searles, we don't know if the gun was seen. I mean, eventually, the gun was presumably seen. I suppose we don't know, though, since the testimony was he either had his hand on his gun or he drew it. But the officer couldn't remember, but the appellate court still recognized, if you're going for your gun, there's something escalating in that situation. Does it make any difference that this whole incident started when you got a lone driver late at night, country road, and apparently the officer decided to follow this car? And from what I read of the briefs, there's no articulated reason as to why the officer would turn around and follow it, other than it's the only car on the road. It's very important, because if this was, in fact, a stop, as it was, the officer would need a reason to be following her, to be stopping her, and to be asking her questions in order for her to not violate the Fourth Amendment. But here, we don't have those reasons given. The officer just, you know, maybe he had a hunch, maybe he was curious. We don't know, but that's not something that is allowed under the Fourth Amendment. There's nothing in the hearing that indicated an articulable reason as to why he did the pursuit actions he did. So he testified that when he turned around to follow her, he didn't have any, nothing suspicious had happened. Right. She was just the only car on the road. Only car on the road, that's his direct quote. Now, at some point, when the state was pressing him on why exactly did you follow a car when you got out of your car, when she turned, he said, oh, well, there was just something awkward. I didn't know if it was her property or not. I thought maybe she was making math. No, I realize that, and that's a whole other issue as far as by this barn. But I'm really looking at when he turned around and followed her. I think that him turning around and following her without any suspicion is certainly a part of the totality of the circumstances, which is being conveyed to Caitlin when she's deciding whether or not she can leave, when the officer actually stops to get out of his car and approaches her. Now, if he had just followed her and nothing happened, she went on her way, she went home, there'd be no violation. You know, if he was being extra careful, but there's no real intrusion on her if an officer decides to follow for a while and make sure that she's driving all right. So we have a car at night going down a private lane and stops behind a building that's 175 yards from a home, and the lights then get turned out in the car, I believe. Didn't I see that? She parked in the lot. Okay. And so is that not a Terry stop? So you don't have to worry about the Fourth Amendment.  Maybe. I don't know if I understand the question. When she stops and parks behind the coal barn, is that a Terry stop? So the question is, is there a difference between a Terry stop and a Fourth Amendment stop? A Terry stop is a Fourth Amendment stop. There are just two different levels of Fourth Amendment stop. There's this Terry stop where all you need is reasonable suspicion. Okay, so you've got a car that's 175 yards from a house and the lights off at night on a private road behind a barn or a shed or whatever it is. Is that reasonable suspicion? So that is not reasonable suspicion. Well, that's okay to do that. To stop at a coal barn. So he can't go up and check that out? The officer can go up and check it out, but he needs – it has to be a consensual encounter. Once he got out with his weapon drawn and parked behind her in that way, if he wanted to just go check on her, he could have gone and asked over his law system, like, just making sure everything's okay, does this your house, do you want to be on your way? That's not what he did. He parked to block her car in late at night and then approached with his gun drawn. That's what makes this a stop, and that's what creates the requirement of reasonable suspicion. So if you look at the Cordero case, which we go through – oh. You'll have a rebuttal. Good morning, Your Honor. Good afternoon, Your Honor. With the court, I am Jay Hoffman. I'm the public prosecutor's office in the Second District. It's my pleasure to be before this court representing the people of the state of Illinois. Starting with the last issue first, just very quickly, we have said that this court can vacate the fines and reinstitute them themselves, as the Fourth District did in Williams and the Second District has in Evangelista. Counsel, in response to that, has raised some issues about the propriety of particular fines. I would argue that under Supreme Court Rule 341H7, any such arguments are forfeited. That rule says that you cannot raise arguments for the first time in the reply brief. There may be no argument in the original brief that there was any problem with any of the individual fines. We don't have to worry about any of that if we say the evidence should have been suppressed and reversed the conviction, right? That's true, Your Honor. I just want to make sure. That's true. No violation, no fines. The second matter, and just briefly, is our jurisdictional argument. We believe that if you look at the language of the statute and how it was amended, the allowance by the Supreme Court for an appeal from someone placed under supervision was added. After the sentencing, the matters were amended. You can appeal from a judgment. We know this is not a judgment. Well, you can appeal from sentences and findings of guilt, but when they inserted appealing from supervision, they said you can appeal from a judgment in the conditions of supervision. And then there's a comma, or the finding of guilt in conditions of sentence, or both. Our position is that inserting that in that way by itself sets it off from the question of a sentence, that being whether it's probation or jail time or whatever. And so it is not designed to allow someone to appeal. Are you making that argument because an order of supervision is not a judgment? That's correct. Then why would the Supreme Court need to put in the Supreme Court rule the phrase finding of guilt? It would almost seem to me the opposite of what you're saying. They're expressly saying, since there isn't a judgment of conviction in a supervision case, we're saying you can appeal from the finding of guilt. But that says finding of guilt or the conditions of sentence or both. That's related to, you see, may appeal from the judgment and may seek review of the conditions of supervision or the finding of guilt in the conditions of sentence or both.  Your argument is that anybody who gets court supervision could never challenge the fact that they were found guilty. That's something that the court in Utsina was concerned with, and the law just basically said, yeah, we're following Utsina. But that's wrong. Once there's a judgment, for instance, this woman had one year of supervision. If that gets revoked and she then has a sentence, once there's a judgment, she can appeal. And the other concern in the reply rule is that, oh, well, we know that a judgment like this – well, not a judgment, I'm sorry – supervision can be used in sentencing in a subsequent crime, and therefore they should be able to appeal it. Well, that's a non-separator and a non-starter also, Your Honor, because we all know that all matters of character of a defendant can be addressed at sentencing. It doesn't have to be a conviction. And in that manner, I did some research because it was raised in their review in their reply rule. I didn't have those cases. But if you do a search, you'll find that the exclusionary rule does not apply at sentencing. So there's no reason to say that because it's supervision, it can't be used at sentencing or you get to appeal it before you have a judgment. My mind tends to drift to the extreme circumstances. So, I mean, you could have a bench trial and the trial judge say, you know, I don't really think the state has proved their case beyond a reasonable doubt, but I'm going to find you guilty anyway, but I'll give you court supervision. And there'd be no right to challenge that or appeal it, unless you'd have to go out and violate your court supervision and have it revoked before you could ever challenge some obvious miscarriage of justice. No, Your Honor, before you could appeal it. In such circumstances, Well, how would you challenge it if you didn't appeal it, if the trial court wrongly found you guilty and said he was or she was? The same way I have several times challenged judges who refuse to sentence someone or do something mandatorily. You take a supervisory order or mandamus to the Supreme Court. Okay. It's not a family appeal, but if a judge says, I don't find it's proven beyond a reasonable doubt, but I'm finding you guilty, that's obviously wrong. It's a clear mandamus. Okay. With regard to the issue of the stop, Your Honor, your question was, is there some import to the fact that he turned around and followed her? I was going to ask you that same question. Thank you. My view is, no. If I'm standing there, let's not do turn around. Let's say I'm a police officer standing on the corner, someone walks by, I'm completely, totally free to turn and walk behind that person. There's nothing wrong with that. A police officer has the right to be anywhere there's a legitimate right, not on someone's private property. And let's be clear here, Ms. Boza, this was not her property. She has no right to raise any problem with him going on the property, with the officer going on the property. The officer has the right to walk along the city streets or drive along the city streets all they want. So that's a non-starter. What happened here was he turned to see what happened. We don't know if he followed her, although one can raise an inference for why else did she pull off. What happened was he saw her car pull off the highway. Then he got up next to or nearer to where DeRoe was, and he saw that there were no lights. Her lights, and he testified that. He didn't know where she was. He didn't know where she was. He didn't see the lights go out or anything like that. He knew she went down the lane, and he didn't know what happened after that. Yes, and he did testify. He said, by the time I got there, there was not enough time for her to have gotten up to where the house was, 175 yards from the pole barn, and he later testified 20 yards from DeRoe. So almost 200 yards. He said there wasn't time for her to get up there like someone returning home would do, and the lights were gone, and it puzzled me. So I pulled up there, and I looked over there, and there's her car back behind the pole barn with the lights off where no one from the street could see her, and that raised his suspicion. So he pulled in without turning on his mother's lights, and yes, it says he parked at an angle, but I disagree. There's no evidence in the record to say that he had locked her in. As a matter of fact, the trial judge was very careful, and I suspect doesn't say because there's no written order or even recorded order of why the judge ruled the way he did, but he was very careful to ask the officer after the parties did. So this was all gravel, right? Yes. And what was it? He says, oh, it was a parking lot, Your Honor, next to the pole barn. And how big was that parking lot, officer? 50 to 60 feet, Your Honor. I said, fine, that's all I wanted to know. So there's indication. First of all, the officer is a car length and a half behind, even if he's at an angle, and the thing's 50 to 60 feet wide. There's a clear indication, and I would say the corn felt so, that she would have been able to pull out and make a U-turn. And didn't the officer testify that if she had driven off, he would have pursued her and stopped her? Yes, he did. But again, that means nothing for us here because the question is what happened when it happened. If he had pursued her and stopped her, then the question would be, did he at that time that he stopped her have grounds to do so? But that's not before us. Counsel says that, well, we have an objective factor of whether or not. This case is very much like Luderman. The only difference is that he drew his weapon. There's no testimony that she knew that he had the weapon out. Counsel says, well, it's an objective test. But I would suggest it's an objective test as far as what the defendant knows at the time. If you look at Mendenhall, Mendenhall says, nothing in the record suggests respondents had any objective reason to believe she was not free to end the conversation and proceed. So it's not a matter of if the person doesn't know any of these things. If you look at the language of Mendenhall, it doesn't speak of getting a weapon out. It speaks of display of a weapon. It also says, a person seized when by means of physical force or show of authority, an officer has in some way restrained the liberty of the citizen by show of authority. So I think it's clear that to suggest that some factor a defendant, a citizen doesn't know of, can be taken into account to determine whether an objective, innocent person in that person's situation feels restrained is just not the law. With that, we would ask you to affirm your amendment. Rebuttal. So the Fourth Amendment reasonable test is not about the rights of the officer to go to a particular place or do a particular thing. And we're not trying to argue that her car was entirely blocked in by the officer's single car. The Fourth Amendment reasonableness standard for whether there's a stop is simply would a reasonable person feel free to ignore that officer. And I think that the fact that the car, his car was parked behind her as well as didn't totally block her, it was one more indication on top of all the others that she needed to engage with this officer and explain why she was where she was. Briefly, as to the fines issue, we did raise that the fines should be vacated. So that is not waived. We've gone into more detail in our reply brief, but there's no reason that should be considered waived. Moving now to reasonable suspicion, the state can only rely on the fact that it was late at night and that she parked at a pole barn instead of parking at the private residence. But this isn't enough for reasonable suspicion. In Cordero, there was a defendant who was parked outside the lines of a darkened parking lot of a closed restaurant at 242 in the morning. As the officer approached, the defendant started to leap. The appellate court said, look, that may seem unusual, but that's not reasonable suspicion that a crime has been committed or is going to be committed. In McGowan, an officer stopped two defendants who were walking in a closed industrial park wearing all black. The court said, this is a really close case. We're going to fine her as reasonable suspicion, but we're going to rely on the fact that this was a commercial place. There's a good reason why they shouldn't be here. And the point of pointing out that this was a private driveway is that when the officer turned to that driveway and pulled up behind her, he didn't know. That could have been her property. She could have been stopping to lock the pole barn. She could park at the pole barn and walk up to the house. You could see the house lit from the pole barn. So there's not reasonable suspicion for this stop. It's hard to believe that an innocent citizen would fail to listen to the instructions of an officer who had just followed them late at night and approached them with their weapon drawn. And it's hard to believe that an officer would want that to be the rule, that you don't have to stop and engage with an officer who's coming at you in that way. You should stop and you should engage. And there's no problem with that. A fourth amendment allows that. And a Terry stop with a gun is approved when there's reason to believe that you're approaching a dangerous criminal. But in this case, there simply weren't objective factors saying that there was a reason to believe. Now, as a final matter, I just want to briefly look at the history of the rule for the jurisdictional argument. If you look at how the rule has been amended, in 1969, Rule 604B didn't allow any appeals from the finding of guilt when some sort of provisional sentence is imposed. Probation was allowed. You were allowed to appeal your finding of guilt before revocation and probation in 1969. In 1975, they added conditional discharge and periodic imprisonment. And there are comments to the rule noting, oh, we're just adding these new types of sentencing structures that the legislature is coming up with. And then in 1983, they added undercourt supervision. There's nothing in the committee comments to say that they're doing this huge change of saying, when you're the offender that we most expect to be reformed, you can't appeal your finding of guilt. And I think it's really hard to believe that the Supreme Court thought, oh, you can't appeal your finding of guilt if you get supervision, but you can bring a writ of mandamus. Clearly, this was intended to allow appeals in this type of case. If there are no questions from the court. Thank you, counsel. Case will be taken under advisory of the Appeals Charter.